IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

TIMOTHY KVECH and DIANE M. KVECH,

        Plaintiffs,

v.                      //   CIVIL ACTION NO. 1:13CV242
                               (Judge Keeley)

ALPINE LAKE PROPERTY OWNERS
ASSOCIATION, INC.

        Defendant.


MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 72]**

Pending before the Court is the motion for summary judgment (dkt. no. 72) filed by the defendant, Alpine Lake Property Owners Association, Inc. ("ALPOA"). For the reasons that follow, the Court **GRANTS IN PART** and **DENIES IN PART** ALPOA's motion.

## I. BACKGROUND

This cases arises from a dispute concerning a right-of-way easement allegedly granted to the plaintiffs, Timothy Kvech ("Mr. Kvech") and his wife Diane Kvech ("Mrs. Kvech") (collectively, the "Kvechs"), by the former general manager of Alpine Lake Resort, James Wilson ("Wilson"). The following facts and any inferences drawn from them are viewed in the light most favorable to the Kvechs, the non-movants. See Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994).

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## A.    Factual Background

The Alpine Lake Resort (the "Resort") encompasses 2000 acres of land located in Terra Alta, West Virginia.  Its eastern boundary is the state line running vertically between Preston County, West Virginia, and Garrett County, Maryland.  Abutting the Resort on the Maryland side is a strip of land, about one-eighth of a mile wide, owned by Hubert M. Gainer ("Gainer").[1]  Bordering the Gainer property to the east and south is a 100-acre tract of land known as the "Snaggy Road Property."

Grace VanSickle had owned the Snaggy Road Property for some time until her death. After she died, the property passed to her estate (the "VanSickle Estate"), which, in February 2010, listed it for sale for $178,500. After receiving little interest, the estate re-listed the property in March 2011 for a reduced price of $139,900.

Mr. Kvech is an avid hunter.  In 2004, he purchased property in Friendsville, Maryland because he had "always wanted a hunting property . . . [a]nd our intent was always to build a hunting cabin on it." (Dkt. No. 73-1 at 5).  After years of owning the

---

[1] The Gainer property is not confined to Maryland, and spreads into West Virginia on the northern side of the Resort.

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Friendsville property, however, Mr. Kvech realized that its steep topography was ill-suited for a hunting cabin, and he continued to search for land that would meet his needs.  Id. at 7.  In December 2011, he came across the listing for the Snaggy Road Property.  His real estate agent, Robert Orr ("Orr"), advised him that it was "landlocked" and "stuck in Orphans' Court,"[2] but that did not dispel Mr. Kvech's interest.

Thereafter, Mr. Kvech and Orr went to visit the Snaggy Road Property.  Initially, they tried to access it from Maryland but were "chased off."  Id. at 8.  After that, they drove through the Resort to the end of Day Lily Court -- a road that ends at the state line.  They then walked from the end of Day Lily Court, across the state line and the Gainer property, onto the Snaggy Road Property.  After viewing approximately twenty-five to thirty percent of the land, Mr. Kvech told Orr, "I love the looks of this property, I love the fact that it's flat, versus Friendsville that's steep, but I'm not going to buy it unless we can get access."  Id. at 9.

To that end, Mr. Kvech's attorney attempted to negotiate a right-of-way easement through an upscale, Maryland subdivision --

---

[2] "Orphan's Court" is Maryland's probate court.

**MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Minnetoska Lake -- on the southeastern side of the Snaggy Road Property, but he was unsuccessful. At that point, Orr advised Mr. Kvech to "go talk to Alpine Lake, because that was the only real feasible access." Id. at 11. Mr. Kvech took his agent's advice and, on December 16 or 17, 2011, approached Wilson, the Resort's general manager. Id. at 16.

Mr. Kvech described his predicament and told Wilson that he needed a right-of-way through the Resort. Wilson, who was familiar with the Snaggy Road Property,[3] showed Mr. Kvech a map of the area, noting in particular Beebalm Court and Burchinal Road. Id. at 17.

Beebalm Court is a road extending almost 1000' northeast off Day Lily Court, but stopping about 700' short of the state line and the Gainer property in Maryland. Burchinal Road is an old dirt road that runs perpendicular to Beebalm Court, intersects Beebalm Court tangentially at the end, and forms the upper boundary of the Resort. It continues southeast through West Virginia, crosses the state line, intersects the Gainer property and the Snaggy Road Property, and then continues into the Minnetoska Lake subdivision that had refused access to Mr. Kvech.

---

[3] In fact, Wilson had negotiated a contract for ALPOA to purchase the Snaggy Road Property, but the board did not approve it. (Dkt. No. 73-1 at 17).

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Prior to 2005, Gainer had been using Burchinal Road to access his property.  However, his right-of-way was blocked after ALPOA granted certain land to a utilities company that then secured a water tank on that land by fencing off the route Gainer had used. To permit Gainer continued access, ALPOA extended Beebalm Court to connect with Burchinal Road, and granted Gainer a right-of-way easement for the use of the Beebalm Court extension (the "Gainer Agreement").  To maintain security, however, ALPOA installed a gate at the end of the Beebalm Court extension and provided Gainer a key.  Notably, the road extension and installation of the gate created a significant drop-off when turning right onto Burchinal Road.  ALPOA promised Gainer that it would mend that portion of the intersection at its own cost.

During his initial conversation with Wilson, Mr. Kvech attempted to quell any concerns Wilson might have about an easement by explaining that he would not "develop the property, use their roads to timber, [or] use the road to extract coal and minerals." Id. at 17.  He also told Wilson, "I'd be willing to buy a lot" in the Resort.  Id.  Wilson responded, "[I]f you were doing all those things, we'd have no problem giving a Right of Way."  Id.  Although not part of their alleged agreement, Mr. Kvech and Wilson also

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

understood that Mr. Kvech would fix the drop-off at the intersection between Beebalm Court and Burchinal Road at his own expense. As Wilson later explained, "I kind of saw that as a win, win for the association." (Dkt. No. 73-4 at 19).

Wilson showed Mr. Kvech "the best lot in Alpine Lake" for him to purchase. (Dkt. No. 73-1 at 18). The lot, which ALPOA had sold to a developer in 2008, was bounded on the northern side by Day Lily Court and on the eastern side by the state line and the Gainer property.

Although Wilson "acted like he had the authority" to grant an easement, Mr. Kvech later admitted that he "didn't do anything else" to ascertain whether Wilson actually possessed such authority. Id. In fact, ALPOA's articles of incorporation[4] state that one of the organization's purposes is to enforce "charges, easements, restrictions, conditions, covenants, and servitudes existing upon and created for the benefit of the property over which the Association may have jurisdiction." (Dkt. No. 73-3 at 23). Furthermore, the bylaws provide that "[t]he affairs of the Association are managed by a seven member Board of Directors,"

---

[4] ALPOA's governing documents are publicly available at http://www.alpinelake.com/images/stories/member_documents/governingdocumentsrevised.pdf.

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

whose powers include "[a]dopting and publishing rules governing the use of those parts of the Subdivision owned by, or under the control of, the Association," and "[e]xercising for the Association all power whose exercise is not reserved to or committed to the members of the Association." Id. at 37-38.

Nevertheless, relying on his initial conversation with Wilson, on January 5, 2012, Mr. Kvech offered the VanSickle Estate the asking price of $139,900 on the Snaggy Road Property. His offer, however, included a contingency that would permit him to determine whether the property was feasible for his intended use of building a hunting cabin. If he determined it was not feasible, he would be able to terminate the contract within ninety (90) days of acceptance.

Around the same time, the VanSickle Estate received another offer from a third party, also for $139,900, but with no contingencies. On January 13, 2012, the VanSickle Estate petitioned the Orphan's Court to approve the sale of the Snaggy Road Property to the third party. Notably, the petition explained why the property had languished on the market:

> That it has been determined that the property is
> landlocked. There is no deeded access to this parcel.
> Efforts have been made over the past year to amicably

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

obtain access from adjoining landowners. Your Petitioners have been unsuccessful.

(Dkt. No. 73-7 at 1).

While that petition was pending, Wilson and Mr. Kvech had several follow-up meetings. Mr. Kvech recalled that, during one such meeting, Wilson assured him that, "if [he] was a dues paying property owner and agreed not to use Alpine's roads for sub-division, mineral extraction and timbering, then there would be no reason I could not have the Right of Way." (Dkt. No. 73-22 at 6). At another meeting, Wilson introduced Mr. Kvech to the then president of ALPOA, Dennis Schiffbauer ("Schiffbauer"), who said that the easement "should not be a problem." Id. Importantly, Wilson informed Mr. Kvech that an easement would require Schiffbauer's approval. (Dkt. No. 73-1 at 18).

On January 20, 2012, Mr. Kvech again met with Wilson "to assure [himself] before purchasing the Snaggy Road property that [he] had an agreement with Alpine regarding access." (Dkt. No. 73-22 at 6). At that meeting, the pair agreed that, "in exchange for a Right of Way, that [Mr. Kvech] would purchase a lot in Alpine and I would agree not to use Alpine's roads for timbering, mineral extraction or sub-division." Id. Mr. Kvech, a savvy businessman, let Wilson know that he "was still concerned about not having [the

8

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

agreement] in writing."  Wilson replied, "[I]n Alpine, a handshake is as good as an agreement."  <u>Id.</u>

Nonetheless, in an effort to alleviate Mr. Kvech's concerns, Wilson provided him a copy of the Gainer Agreement and said, "[W]e'll use this."  (Dkt. No. 73-1 at 24).  "The assurances and oral agreement that [Wilson] gave me on this day," explained Mr. Kvech, "is [sic] what gave me the confidence to purchase the Snaggy property, the Alpine lot and to sell my Friendsville hunting property."  (Dkt. No. 73-22 at 7).  However, Mr. Kvech conceded that an easement for Burchinal Road was not the only piece of the puzzle.  He also would need an easement across the Gainer property to get to the Snaggy Road Property.  In fact, Mr. Kvech had conversations with Gainer, who told him, "[I]f Alpine gives you an Agreement, then we've got no problem doing it."  (Dkt. No. 73-1 at 21).

Based on these dealings, on February 6, 2012, Mr. Kvech made another offer on the Snaggy Road Property, this time for $145,000 with no contingencies. The following day, having no knowledge of Mr. Kvech's new offer, the Orphan's Court approved the VanSickle Estate's petition for approval of the sale to the third party. Subsequently, Mr. Kvech and the VanSickle Estate each moved the

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

court to vacate its order granting the petition, and instead to approve the sale based on Mr. Kvech's superior offer of $145,000 with no contingencies. Mr. Kvech's motion explained that "the factors for selling the property below the appraised value enumerated in the [VanSickle Estate's] prior petition have not changed and are incorporated herein by reference." (Dkt. No. 73-10 at 2). On March 6, 2012, the court granted the motions, vacated its previous order, and approved the sale of the Snaggy Road Property to Mr. Kvech for $145,000 with no contingencies. The VanSickle Estate deeded the Snaggy Road Property to Mr. Kvech on March 9, 2012.

On April 5, 2012, the Kvechs purchased the lot in the Resort from the developer for $6500. That same day, Mr. Kvech met with Wilson to let him know "I would like to start improving Burchinal Road . . . so that my builder could start building my cabin before the winter." (Dkt. No. 73-22 at 7). Wilson agreed and, sometime thereafter, provided a key for the gate on Beebalm Court to Mr. Kvech's contractor.

Significantly, Wilson resigned as general manager of the Resort on May 15, 2012. Nevertheless, Mr. Kvech's contractor began repairing the drop-off and improving Burchinal Road between Beebalm

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Court and the state line, and had incurred $6135 in costs as of May 21, 2012. (Dkt. No. 78-3 at 20).

On May 23, 2012, Mr. Kvech, apparently still unaware of Wilson's resignation, e-mailed Wilson a proposed right-of-way agreement drafted by his attorney, who had used the Gainer Agreement as a template, and had inserted material information from a survey paid for by Mr. Kvech. In the e-mail, Mr. Kvech requested Wilson to "have Alpine Lake's attorney review the enclosed Right of Way Agreement . . . and then the association President can sign and send back to me." (Dkt. No. 73-17 at 1). He further advised that ALPOA's attorney "can also modify [the proposed agreement] in any way they [sic] feel appropriate." Id.

As evidenced by the following e-mail from May 27, 2012, sent by Schiffbauer to the other board members, the board was aware of Mr. Kvech's proposed right-of-way agreement and the construction underway on Burchinal Road:

> About 2 weeks ago there were several truckloads of gravel being brought in to Alpine. I saw one and inquired if someone was building. I was told it was going to Burchinal Trail. I thought that the Shaffer/Gainer bunch were improving their access. As it turns out, Jim [Wilson] apparently agreed to let this new land owner in Maryland to [sic] access his property this way. A letter

11

> just came in[5] - found it today on Jim's desk - addressing
> this issue.  It appears to be a deed for right of way.
> I will review it tomorrow and seek counsel from Buddy
> Turner.  I also told Grace to see me tomorrow.  I don't
> know if said owner has any agreement with Shaffer/Gainer
> bunch.  I will try to get answers tomorrow.

(Dkt. No. 87-1 at 1).  The following day, another board member,

Charles Clark, replied:

> [T]he work commenced at the end of Beebalm Ct the 18th or
> 19th of May.  I asked Jim [Wilson] about it then and he
> said it was one of the areas adjacent to Alpine Lake
> property to which a land owner had easement access to his
> property via Alpine Lake roads.  There was no discussion
> about any document being signed or the scope of work to
> take place on the property.

Id.

Another board member, Fred Issenock ("Issenock"), who took

over for Schiffbauer as president of ALPOA in June 2012, also had

noticed the construction, and had ordered security to "stop all the

trucks coming in."  (Dkt. No. 83-2 at 3).  According to Issenock,

this "stopped the process," effectively blocking Mr. Kvech's access

to the right-of-way easement on Burchinal Road.  Id. at 4.

On June 25, 2012, Mr. Kvech e-mailed Issenock, advising him of

the dealings between himself and Wilson.  As a result of that e-

---

[5] On the e-mail that was turned over in discovery, the words "just
came in" are stricken, and a handwritten note explains that the "letter"
referenced the e-mail had been there "for some time."  (Dkt. No. 87-1 at
1).

**MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

mail, Mr. Kvech met with the ALPOA board on June 25, 2012. Although it is unclear exactly what transpired at that meeting, on the same day, Mr. Kvech sent Isennock another e-mail, asserting that, "based on the facts and circumstances (previous use of Burchinal Rd., fence, Oral Agreement with Jim, etc.) that it is almost certain that a Court would grant a ROW." (Dkt. No. 73-19 at 1). He cautioned that, "[i]f we are in Court . . . it will be up to the Court to decide the terms of the ROW agreement." Id.

On July 12, 2012, the board sent a letter to Mr. Kvech's attorney, advising that it had convened and "unanimously voted _**not**_ to grant Mr. Kvech the right of way requested in his correspondence dated May 23, 2012." (Dkt. No. 73-20 at 1) (emphasis in original). During meetings on July 20, 2012, and October 19, 2012, the board twice more voted to deny subsequent requests for a right-of-way made by Mr. Kvech.

**B.    Procedural Background**

In March 2013, the Kvechs filed a complaint,[6] alleging that ALPOA had breached its oral agreement to grant them a right-of-way

---

[6] The Kvechs originally filed their complaint in the United States District Court for the District of Maryland, but because the case involves West Virginia realty, Judge Motz transferred it to this Court on October 24, 2013.

13

### MEMORANDUM OPINION AND ORDER
### GRANTING IN PART AND DENYING IN PART
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

easement. The sole remedy sought under each of the first four counts is specific performance of the putative agreement. The fifth count asserts a violation of the West Virginia Consumer Credit and Protection Act (the "WVCCPA") and seeks damages of $500,000. Notably, although the Kvechs did not demand a jury trial in their complaint, ALPOA demanded a jury in its answer to the complaint.

On November 10, 2014, ALPOA filed the instant motion for summary judgment, arguing that: (1) Wilson lacked actual or apparent authority to convey an easement to Mr. Kvech; (2) the parties never formed a binding agreement; (4) the statute of frauds bars the enforcement of any agreement; (5) judicial estoppel precludes the Kvechs' breach of contract claim; and (6) the Kvechs cannot recover damages under the WVCCPA.[7] The motion is fully briefed and ripe for review.

### II. STANDARD OF REVIEW

Summary judgment is appropriate where the "depositions, documents, electronically stored information, affidavits or

---

[7] Although ALPOA also argues that Mrs. Kvech is not a proper party to this case, that issue has no bearing on whether ALPOA breached an agreement with Mr. Kvech, which, for the reasons discussed below, is the only remaining claim in this case.

**MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

declarations, stipulations . . ., admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a), (c)(1)(A). When ruling on a motion for summary judgment, the Court reviews all the evidence "in the light most favorable" to the nonmoving party. <u>Providence Square Assocs., L.L.C. v. G.D.F., Inc.</u>, 211 F.3d 846, 850 (4th Cir. 2000). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). Once the moving party has made the necessary showing, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 256 (internal quotation marks and citation omitted). The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment; the

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

evidence must be such that a rational trier of fact could reasonably find for the nonmoving party. Id. at 248–52.

### III. DISCUSSION

The legal issues in this case center around whether Mr. Kvech had a binding easement agreement for a right-of-way with ALPOA, and, if so, whether that agreement can and should be enforced. The first of these questions involves disputed factual issues that will have to be resolved by a jury. The second question, particularly whether a right-of-way easement should be enforced, involves equitable considerations to be weighed by the Court only after a jury has determined whether a binding contract existed. Finally, as discussed below, the Court finds no merit in the Kvechs' claim for damages under the WVCCPA.

**A.   Wilson's Authority to Grant an Easement**

ALPOA contends that Wilson lacked any authority to bind it to a right-of-way easement agreement. Under West Virginia law, "[a] principal is bound by acts of an agent if those acts are either within the authority the principal has actually given his agent, or within the apparent authority that the principal has knowingly permitted the agent to assume." Clint Hurt & Assocs., Inc. v. Rare Earth Energy, Inc., 480 S.E.2d 529, 535 (W. Va. 1996) (per curiam)

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

(quoting Thompson v. Stuckey, 300 S.E.2d 295, 299 (W. Va. 1983)).
Here, there is no dispute that Wilson, as the general manager of
the Resort, was an agent of ALPOA, the principal. The relevant
question is whether he had actual or apparent authority to bind
ALPOA to a right-of-way easement agreement with Mr. Kvech.

**1. Actual Authority**

ALPOA urges that its governing documents "establish that the
general manager did not have authority to grant access to adjacent
properties," and that "this authority rests solely with the Board
of Directors." (Dkt. No. 83 at 6). Indeed, there is good reason
to look to the board's governing documents in examining the
question of actual authority.

In Clint Hurt, the Supreme Court of Appeals of West Virginia
was asked to determine whether an "Additional General Partner," as
an agent of the partnership, had actual authority to bind the
partnership to a contract. 480 S.E.2d at 534-35. In answering the
question, the court relied exclusively on "the plain language of
the partnership agreement," which stated that "Additional General
Partners have delegated all of their authority as General Partners,
except as specifically provided for in the Partnership Agreement,
to the Managing General Partner and have no authority to bind the

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Partnership or other Partners." Id. at 535 (emphasis in original).
Based on that language, the court concluded that the agent lacked
actual authority to bind his principal, the partnership, to a
contract. Id.

In Clint Hurt, the partnership agreement expressly denied
authority to the additional general partners to bind the
partnership in contract. ALPOA points to a provision in its bylaws
that delegates to the board the power of "[a]dopting and publishing
rules governing the use of those parts of the Subdivision owned by,
or under the control of, the Association."[8] (Dkt. No. 73-3 at 38).
Because this provision is not an express denial of the general
manager's authority to bind ALPOA in contract, however, it does not
fit the Clint Hurt analysis.

Rather, the issue here is whether Wilson believed he had the
actual authority to contract with Mr. Kvech. "An agent acts with
actual authority when, at the time of taking action that has legal
consequences for the principal, the agent reasonably believes, in
accordance with the principal's manifestations to the agent, that
the principal wishes the agent so to act." Restatement (Third) of

---

[8] ALPOA has not presented any rules promulgated by the board that
would affect Wilson's actual authority to bind ALPOA in contract.

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Agency § 2.01 (2006) (cited by <u>Ashland Facility Operations, LLC v.</u>
<u>N.L.R.B.</u>, 701 F.3d 983, 990 (4th Cir. 2012)).

There is no dispute that Wilson knew he lacked actual
authority to bind ALPOA to a right-of-way easement agreement with
Mr. Kvech. As he explained, "the general manager could make the
contract and write it up, but the contract had to be signed by the
president of the board of directors and the secretary." (Dkt. No.
73-4 at 9). Again, he stated, "[t]he contract is only binding when
it's signed by the president of the association and the secretary."
<u>Id.</u> at 24. Thus, Wilson had no actual authority to bind ALPOA to
a right-of-way easement agreement.

### 2. Apparent Authority

Despite no dispute about Wilson's actual authority to bind
ALPOA to a right-of-way easement agreement with Mr. Kvech, material
questions of fact exist as to whether Wilson possessed apparent
authority to do so. Unlike actual authority, which looks to the
reasonable belief of the agent, apparent authority concerns the
reasonable belief of the third party. "Apparent authority is the
power held by an agent or other actor to affect a principal's legal
relations with third parties when a third party reasonably believes
the actor has authority to act on behalf of the principal and that

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

belief is traceable to the principal's manifestations." Restatement (Third) of Agency § 2.03 (2006) (cited by Ashland Facility Operations, 701 F.3d at 990).  The Supreme Court of Appeals of West Virginia has explained that "an agent's apparent authority is, as to third persons dealing in good faith with the subject of the agency and entitled to rely upon such appearance, his real authority."  All Med, LLC v. Randolph Eng'g Co., 723 S.E.2d 864, 871 (W. Va. 2012) (quoting Gen. Elec. Credit Corp. v. Fields, 133 S.E.2d 780, 783 (W. Va. 1963)).

It is uncontroverted that, at one of the initial meetings between Wilson and Mr. Kvech, Schiffbauer was present and told them that the right-of-way agreement "shouldn't be a problem."  As Mr. Kvech later explained, "[A]fter talking to Jim [Wilson] and the president [Schiffbauer] saying, shouldn't be a problem, I thought I had an agreement and I thought I was dealing with people of authority."  (Dkt. No. 73-1 at 19).  Moreover, "no one told me anything about board approval or a secretary signing."  Id.  Wilson concurred with Mr. Kvech's interpretation of the conversation with Schiffbauer, explaining, "[A]t that point in time I think that we gave Tim the assurances that we didn't think there would be a problem with getting a right-of-way."  (Dkt. No. 73-4 at 10).

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Based on this evidence, summary judgment on the issue of Wilson's apparent authority is inappropriate. It is for the jury to determine whether, based on Schiffbauer's overture, Mr. Kvech's belief that Wilson possessed the authority to enter into a binding right-of-way easement agreement was reasonable. See Thompson v. Stuckey, 300 S.E.2d 295, 299 (W. Va. 1983) (concluding that "[i]t was not improper for the court to submit this question [of apparent authority] to the jury").

**B.    Formation of an Agreement**

Assuming Wilson possessed apparent authority to bind ALPOA, the question becomes whether any genuine dispute of material fact exists concerning the formation of the agreement. Contract formation of course requires an offer and acceptance. See Dan Ryan Builders, Inc. v. Nelson, 737 S.E.2d 550, 556 (W. Va. 2012). Consideration is also an essential element. See First Nat. Bank of Gallipolis v. Marietta Mfg. Co., 153 S.E.2d 172, 177 (W. Va. 1967). Finally, "[a] meeting of the minds of the parties is a sine qua non of all contracts." Syl. Pt. 2, Triad Energy Corp. of West Virginia, Inc. v. Renner, 600 S.E.2d 285, 286 (W. Va. 2004) (italics in original).

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Here, there is evidence of an offer and acceptance. Mr. Kvech approached Wilson in December 2011 expressing an interest in gaining access to the Snaggy Road Property through the Resort. Wilson told him, "[W]e have a right-of-way to that property already at the backside of Alpine Lake . . . I don't see any reason why we shouldn't be able to give you a right-of-way." (Dkt. No. 73-4 at 10). "But," Wilson continued, "I can't get you a right-of-way until you have a deed." Id. Their conversation is evidence of a unilateral parol agreement –- Wilson promised to grant a right-of-way easement if Mr. Kvech purchased a lot in the Resort.

There is also evidence of consideration. Wilson made a promise to grant the easement, and Mr. Kvech purchased the lot in the Resort. Although ALPOA observes that Wilson purchased the lot from a third party developer, that transaction indisputably had been discussed with Wilson and accrued benefits to ALPOA. For example, Wilson explained that he was "very interested" in having somebody purchase the lot on the Maryland border in order to "secure" the Resort from trespassers. Id. at 10. Moreover, when Mr. Kvech purchased the lot, its status changed from a developer lot, owing $80 per year in association dues, to a single owner lot,

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

owing $875 per year in association dues.  Because of that, Wilson explained, "[y]ou want them to buy a lot."  Id. at 15.

Finally, there is more than a scintilla of evidence of a meeting of the minds as to the contract's essential terms.  Those terms were known to the parties as early as their initial meeting in December 2011, when Wilson apprised Mr. Kvech of all the requisite restrictions on the easement.  Moreover, during their January 20, 2012 meeting, Wilson handed Mr. Kvech a copy of the Gainer Agreement, stating that it "represents the agreed terms." (Dkt. No. 73-22 at 4).

Based on this evidence, the Court denies summary judgment to ALPOA on the Kvechs' breach of contract claim.  "Generally, the existence of a contract is a question of fact for the jury."  Syl. Pt. 4, Cook v. Heck's, Inc., 342 S.E.2d 453, 454 (W. Va. 1986). The question of whether the parties formed a binding agreement is in dispute and is properly reserved for the jury's determination.

## C.    Specific Performance

Should a jury determine that Wilson possessed apparent authority to enter into a right-of-way agreement on behalf of ALPOA, and that he did in fact enter into such an agreement with Mr. Kvech, the next question is whether that oral agreement can be

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

enforced. Generally speaking, oral agreements for interest in land are unenforceable under West Virginia's statute of frauds, which provides that "[n]o contract for the sale of land, or the lease thereof for more than one year, shall be enforceable unless the contract or some note or memorandum thereof be in writing and signed by the party to be charged thereby, or by his agent." W. Va. Code § 36-1-3.

In the case of easements, however, West Virginia law recognizes that a defendant may be estopped from asserting the statute of frauds as a defense to enforceability when equity so demands. See, e.g., Cottrell v. Nurnberger, 47 S.E.2d 454, 458 (1948). If a court weighs the equitable considerations and determines that the balance tips in favor of the plaintiff, specific performance may provide a remedy for a breach of the parties' oral agreement. See Brand v. Lowther, 285 S.E.2d 474, 479 (W. Va. 1981) ("The remedy of specific performance of a contract is not a matter of right in either party, but rests in the sound discretion of the court, to be determined from all the facts and circumstances of the case."). However, even if equity weighs in favor of specific performance, that remedy is not available where legal damages would provide the plaintiff with adequate relief.

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

See Callaham v. First Nat. Bank of Hinton, 30 S.E.2d 735, 738-39 (W. Va. 1944).

Here, the Kvechs seek an order granting specific performance of the right-of-way easement on Burchinal Road. "To invoke this extraordinary remedy, the [Kvechs] must prove a contract enforceable at law." Brand, 285 S.E.2d at 479. Because a jury has yet to conclude whether an enforceable agreement existed, the Court must defer any ruling regarding whether specific performance is a permissible remedy.

**D.    Judicial Estoppel**

ALPOA further contends that the doctrine of judicial estoppel precludes the Kvechs from alleging breach of contract. "[J]udicial estoppel, or preclusion against inconsistent positions, is designed to protect the integrity of the courts and the judicial process." Guinness PLC v. Ward, 955 F.2d 875, 899 (4th Cir. 1992). "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . ." New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (alteration in original) (citation omitted). ALPOA argues that Mr. Kvech took inconsistent positions by representing to the Orphan's

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Court that the Snaggy Road Property was landlocked at the time he purchased it, and later explaining in his deposition testimony that he thought he had an easement prior to purchasing the Snaggy Road Property.

Mr. Kvech purchased the Snaggy Road Property on March 9, 2012. Any contract he had with ALPOA was not formed until he purchased a lot in the Resort; as Wilson told him, "I can't get you a right-of-way until you have a deed." (Dkt. No. 73-4 at 10). Mr. Kvech did not purchase a lot until almost one month later, on April 5, 2012. Thus, notwithstanding his apparent belief that a contract had formed prior to that date, Mr. Kvech did not take inconsistent positions. Moreover, "landlocked" means "[s]urrounded by land, with no way to get in or out except by crossing the land of another." Black's Law Dictionary (9th ed. 2009). Thus, the Snaggy Road Property was still landlocked and remains so (with respect to Mr. Kvech) despite any easement. The Court therefore rejects ALPOA's judicial estoppel argument.

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## E.    Gist of the Action

To the extent the Kvechs have pled any common law tort claims in their complaint,[9] specifically fraud, such claims are barred by the gist of the action doctrine, which precludes recovery in tort where any liability stems from a breach of contract. See Gaddy Eng'g Co. v. Bowles Rice McDavid Graff & Love, LLP, 746 S.E.2d 568, 577 (W. Va. 2013). Despite not seeking damages for any common law tort claims in their complaint, the Kvechs, in their briefs, assert that they are entitled to recover the cost of their improvements to Burchinal Road based on ALPOA's alleged fraud.

There is no dispute that Mr. Kvech intended to absorb the costs of improving Burchinal Road. (Dkt. No. 73-22 at 3) ("The cost of improving Burchinal Road . . . would be my responsibility."). If ALPOA had not breached the alleged right-of-way agreement, as the Kvechs allege, they could not assert a right to recover those costs. Thus, the costs of the improvements are, by definition,

---

[9] Notably, none of the ad damnum clauses pertaining to the Kvechs' first four counts seeks damages. Rather, each one requests "that this Court compel the Defendant by Order of this Court to execute a Right of Way Deed of Easement and allow access through Alpine Lake to the Plaintiffs' property in Maryland." (Dkt. No. 1 at 7). Only under the fifth count for a violation of the WVCCPA do the Kvechs seek damages in the amount of $500,000, as well as "such further and other relief as the statute may allow." Id. at 8.

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

consequential damages incurred solely as a result of ALPOA's alleged breach. See Rice v. Cmty. Health Ass'n, 203 F.3d 283, 287-88 (4th Cir. 2000) (quoting Desco Corp. v. Harry W. Trushel Constr. Co., 413 S.E.2d 85, 89 (W. Va. 1991)) (explaining that consequential damages occur when the parties "could reasonably have anticipated" that they "would be a probable result of a breach"). Because these damages are contractual in nature, they are not recoverable under a tort theory.

**F.    WVCCPA**

In Count Five of their complaint, the Kvechs allege that ALPOA violated the WVCCPA, W. Va. Code § 46A-1-101, et seq., by "induc[ing] [them] to purchase the lot number 40 in Alpine Lake as a condition of granting access to the Snaggy Road property." (Dkt. No. 1 at 7). ALPOA contends that the Kvechs "awkwardly attempt to fit the facts of this case into the mold of a cause of action under the [WVCCPA]," and argues that the WVCCPA does not apply to the Kvechs' purchase of the lot. (Dkt. No. 73 at 11).

The WVCCPA provides that "[a]ny person who purchases or leases goods or services and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice

prohibited or declared to be unlawful by the provisions of this article may bring an action" against "the seller or lessor." § 46A-6-106(a). The acts or practices declared unlawful are "[u]nfair methods of competition and unfair or deceptive acts or practices." § 46A-6-104. The "definitions" section of the statute enumerates sixteen types of misrepresentations that constitute unfair methods of competition and unfair or deceptive acts or practices. § 46A-6-102(7)(A)-(P).

The Kvechs base their cause of action under the WVCCPA upon ALPOA's continuing obligation to provide them with services and amenities in return for their payment of association dues. (Dkt. No. 78 at 9). In their complaint, however, they never allege that ALPOA misrepresented anything with respect to the services it provides as a homeowners association to its members. Nor is there any allegation that ALPOA misrepresented anything about the lot the Kvechs purchased from the developer who previously had owned it.

Indeed, the only misrepresentation alleged by the Kvechs is that ALPOA told Mr. Kvech he could use Burchinal Road and then prevented him from doing so. ALPOA's alleged failure to follow through on its promise, however, does not present a cause of action rooted in the WVCCPA, as the Kvechs urge. Therefore, because ALPOA

**MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

did not misrepresent anything about any goods or services it provided the Kvechs, their claim under the WVCCPA fails.

### IV. CONCLUSION

At bottom, this case involves the purported breach of an alleged oral agreement between ALPOA and Mr. Kvech, as well as the equitable considerations involved in determining, if such a contract was formed, whether specific performance of the right-of-way easement should be enforced. The facts and allegations do not support any other claims.

The breach of contract claim, moreover, presents genuine issues of material fact that will have to be decided by a jury, including whether Wilson possessed apparent authority to bind ALPOA in contract, and whether a contract existed. If a jury finds for the Kvechs on both of those issues, the Court then will have to determine whether specific performance is an appropriate remedy.

In conclusion, for the reasons discussed, the Court **GRANTS IN PART** and **DENIES IN PART** ALPOA's motion for summary judgment.

It is so **ORDERED.**

**MEMORANDUM OPINION AND ORDER**
**GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

The Court directs the Clerk to transmit copies of this Memorandum Opinion and Order to counsel of record.

DATED: February 11, 2015.

/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE